# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ADVOCATES FOR HIGHWAY AND AUTO SAFETY | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No.: 07-00467 (RWR) |
| v. | ) ) | |
| FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION | ) ) ) ) | |
| Defendant. | ) ) | |

## <u>DEFENDANT'S MOTION FOR A STAY OF PROCEEDINGS</u>

Pursuant to 5 U.S.C. § 552(a)(6)(C), Defendant Federal Motor Carrier Safety Administration ("FMCSA"), by and through undersigned counsel, hereby moves to stay the proceedings in this action. Although FMCSA is exercising due diligence to respond to Plaintiff's FOIA request, exceptional circumstances have prevented the agency from processing the request within the statutory time limit. Those circumstances include a massive volume of potentially responsive records — approximately 448,000 pages have been identified to date — and a backlog of "complex" FOIA requests. Accordingly, FMCSA requests entry of a 2 year stay of the instant proceedings, to allow FMCSA sufficient time to process the voluminous records involved in Plaintiff's broad FOIA request.

In accordance with Local Civil Rule 7(m), Defendant sought Plaintiff's position on this motion, and Plaintiff opposes the motion.  A supporting memorandum of points and authorities and proposed order are attached.

Dated: May 24, 2007

Respectfully submitted,


            /s/
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


            /s/
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


            /s/ Robin M. Meriweather
ROBIN M. MERIWEATHER, D.C. Bar. # 490114
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C.  20530
Phone: (202) 514-7198
Fax: (202) 514-8780
Robin.Meriweather2@usdoj.gov

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ADVOCATES FOR HIGHWAY AND AUTO SAFETY | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No.: 07-00467 (RWR) |
| v. | ) ) | |
| FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION | ) ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR A STAY OF PROCEEDINGS

This case involves a Freedom of Information Act ("FOIA") request for records documenting the Federal Motor Carrier Safety Administration's ("FMCSA's") development and consideration of plans or programs to implement the cross-border trucking provisions of the North American Free Trade Agreement ("NAFTA"). Plaintiff seeks all FMCSA records from December 2001 through October 2006 concerning the consideration or development of any program to evaluate the ability of Mexican motor carriers to operate in the United States. Plaintiff also seeks all records from that same time period that address how any such effort, plan, or program complies with a federal statute that conditions FMCSA's use of appropriated funds to review Mexican motor carriers' applications for operating authority upon FMCSA's implementation of specific application and safety-monitoring requirements for those carriers.

Although FMCSA has made a diligent, good-faith effort to respond to Plaintiff's FOIA request as quickly as possible, the breadth of the request has made it impossible for FMCSA to complete its search and processing of responsive records within the default statutory limits for

responding to FOIA requests.  To date, FMCSA has identified 448,000 pages of potentially responsive documents at FMCSA offices throughout the country.  FMCSA has received over 525 "complex" FOIA requests in fiscal year 2007, and despite the agency's efforts to reduce the FOIA backlog, several "complex" requests remain ahead of Plaintiff's request in the queue. FMCSA will procure commercial litigation support services to process this FOIA request. However even with those outside resources, FMCSA projects that it will need 18 to 24 months to complete its response to the request.

Given the breadth of Plaintiff's request and FMCSA's diligent efforts to respond to it, the Court should stay the instant proceedings for two years.  Congress did not intend that agencies be required to defend FOIA litigation in circumstances such as these.  Instead, section 552(a)(6) of the Freedom of Information Act expressly provides that courts may give an agency additional time to process a request when "exceptional circumstances" impede the agency's ability to respond to a FOIA request within twenty business days.  5 U.S.C. § 552(a)(6)(C)(i).  A requesting party's refusal to narrow its request is one of the factors courts consider when determining whether those "exceptional circumstances" are present.  *See id.* § 552(a)(6)(C)(iii). Here, FMCSA has taken steps to reduce its FOIA backlog, is retaining outside contractors to process Plaintiff's FOIA request, and has requested that Plaintiff narrow its request.  In light of those facts and Plaintiff's refusal to submit a more focused FOIA request, a stay should be entered in this case.

## BACKGROUND

### A.    The Freedom of Information Act

The Freedom of Information Act ("FOIA" or the "Act"), requires federal agencies that have received a "request for records which . . . reasonably describes such records" to "promptly" provide the records to the requesting party.  5 U.S.C. § 552(a)(3).  Within twenty business days, the agency generally must determine "whether to comply with such request," and then notify the requesting party of its determination and the reasons therefor.  *Id.* § 552(a)(6)(A)(i).  If an agency does not respond within the statutory time limit, the requesting party will be deemed to have "constructively" exhausted administrative remedies, and may proceed to court without having to "actually" exhaust.  *Id.* § 552(a)(6)(C).

However, Congress recognized that in "exceptional circumstances," an agency may need additional time to process and respond to a request for records.  *Id.* § 552(a)(6)(C).  Specifically,

> If the Government can show exceptional circumstances exist and that the agency is exercising due diligence in responding to the request, the court may retain jurisdiction and allow the agency additional time to complete its review of the records.

*Id.* § 552(a)(6)(C)(i). Congress elaborated upon the "exceptional circumstances" requirement in 1997 amendments to the FOIA.  A delay that "results from a predictable agency workload" of FOIA requests may only constitute "exceptional circumstances" if the agency "demonstrates reasonable progress in reducing its backlog of pending requests."  *Id.* § 552(a)(6)(C)(ii).  Further, a requesting party's "refusal . . . to reasonably modify the scope of a request . . . after being given an opportunity to do so by the agency to whom the person made the request" is a factor courts consider when determine whether "exceptional circumstances" exist.  *Id.* §

552(a)(6)(C)(iii).

**B.    The Federal Motor Carrier Safety Administration's Implementation of the North American Free Trade Agreement's Cross-Border Trucking Provisions**

In 1992, the United States signed the North American Free Trade Agreement ("NAFTA"), which became effective January 1, 1994.  *See Berriochoa Lopez v. United States,* 309 F. Supp. 2d 22, 24 (D.D.C. 2004).  Congress subsequently passed legislation to enact NAFTA into federal law.  *See* 19 U.S.C. §§ 3301 *et seq.*  Since 1982, the operations of most Mexican motor carriers in the United States have been limited to commercial zones along the U.S.-Mexico border.  *See* 72 Fed. Reg. 23,883 (May 1, 2007).  As part of NAFTA, the United States agreed to phase out a moratorium on new grants of cross-border operating authority to Mexican motor carriers seeking to operate throughout the United States.  *See Department of Transportation v. Public Citizen*, 541 U.S. 752, 759-60 (2004).  Specifically, Annex 1 of NAFTA reflects the United States' agreement that "Mexican nationals would be permitted to obtain operating authority to provide cross-border trucking services in four border states three years after the signing of the agreement (December 18, 1995) and that Mexican nationals would be authorized to operate throughout the United States six years after the treaty signing (January 1, 2000)." *Berriochoa Lopez*, 309 F. Supp. 2d at 24.

In 1998, the Mexican government invoked NAFTA's dispute resolution provisions, and requested arbitration of the United States' compliance with the cross-border trucking provisions in Annex 1.  *See id.*  The arbitration panel issued its final report in February 2001.  *See id.*  The panel found that the United States' refusal to grant Mexican motor carriers' applications for operating authority in the United States breached the United States' obligations under NAFTA. *See Department of Transportation*, 541 U.S. at 760.  Thereafter, the President "made clear his

intention to lift the moratorium on Mexican motor carrier certification following the preparation of new regulations governing grants of operating authority to Mexican motor carriers." *Id.*

Several statutory and regulatory actions followed the President's commitment to implement NAFTA's cross-border trucking provisions. In May 2001, FMCSA published proposed rules concerning safety regulation of Mexican motor carriers. *See id.* In December 2001, Congress enacted the Department of Transportation and Related Agencies Appropriations Act (the "Appropriations Act"), 115 Stat. 833. Section 350 of the Appropriations Act provided that "no funds appropriated under the Act could be obligated or expended to review or to process any application by a Mexican motor carrier for authority to operate in the interior of the United States until FMCSA implemented specific application and safety-monitoring requirements for Mexican carriers." *Id.* Congress extended those conditions to appropriations for subsequent fiscal years. *See Department of Transportation*, 541 U.S. at 761.

Since 2001, FMCSA, the Department of Transportation, and other portions of the federal government have discussed and attempted to develop rules and policies to implement NAFTA's cross-border trucking provisions. In March 2007, the Administrator of FMCSA announced that FMCSA was implementing a "one-year demonstration project to authorize up to 100 Mexican trucking companies to perform long-haul operations within the U.S." Test. of Jeffrey N. Shane before the House Transportation and Infrastructure Subcommittee on Highways and Transit (Mar. 13, 2007) (Exh. 1 hereto) (avail. at http://www.fmcsa.dot.gov/about/news/testimony/tst-031307.htm). That demonstration project was designed to demonstrate the effectiveness of the systems FMCSA has developed to comply with the requirements of Section 350 of the Appropriations Act. *See id.*

## C.      Plaintiff's FOIA Request

Plaintiff  Advocates for Highway and Auto Safety ("AHAS") sent FMCSA a FOIA

request (the "AHAS FOIA Request" or the "Request") asking the agency to produce records

concerning numerous aspects of FMCSA's implementation of NAFTA's cross-border trucking

provisions and FMCSA's compliance with Section 350 of the Appropriations Act.  The FMCSA

FOIA Office received the AHAS FOIA Request on October 25, 2006, and logged that request

into the system the day it was received.  *See* Declaration of Tiffanie C. Coleman, dated Apr. 11,

2007, ¶ 6 (attached as Exhibit A to Exhibit 2 hereto) (hereafter "First Coleman Decl.").  The

AHAS FOIA request sought:

> All records regarding any and all FMCSA activities to formulate, develop,
> evaluate, implement, or otherwise consider any effort, plan, initiative, pilot
> program or other program intended to evaluate any Mexico-domiciled motor
> carriers that would be permitted by FMCSA to operate beyond the current U.S.
> municipalities and commercial zones on the U.S. – Mexico border.
>
> All records that discuss, evaluate, consider or refer to how such an effort, plan,
> initiative, pilot program or other program for evaluating any Mexico-domiciled
> motor carriers operating beyond the current U.S. municipalities and commercial
> zones on the U.S.– Mexico border complies with the funding restriction of
> Section 350(a) of the Fiscal Year 2002 U.S. Department of Transportation and
> Related Agencies Appropriations Act**,** Pub. L. 107-87 (Dec. 18, 2001)
>
> All records that consider, discuss, evaluate, or refer to the specific policy
> considerations, decisions, and actions by the FMCSA and the U.S. Department of
> Tranportation for how any such pilot program or other program, plan, or initiative
> for evaluating some Mexico-domiciled motor carriers operating beyond the
> current U.S. municipalities and commercial zones on the U.S. – Mexico border
> complies with each specific requirement set forth in Sectionw 350(a) and (b) of
> the Fiscal Year 2002 U.S. Department of Transportation and Related Agencies
> Appropriations Act cited above.

*Id.* at Exh. 1.  The request further provided that its scope "includes, but is not limited to, drafts,

memoranda, letters, electronic mail and files, technical analyses, technical assistance documents,

and tables, both at headquarters and agency field offices," and that it covered the period from December 18, 2001 through October 25, 2006. *Id.*

The AHAS FOIA Request was a "complex" FOIA. *See* Declaration of Tiffanie C. Coleman, dated May 23, 2007,¶ 4 (hereafter "Second Coleman Decl.); First Coleman Decl., ¶ 6. That is, it asked for multiple records, involved multiple custodians of records within FMCSA, involved multiple FMCSA research systems, and involved an issue which would require legal review. *See* First Coleman Decl., ¶ 4. To date, FMCSA has received approximately 526 complex FOIAs for fiscal year 2007. *See* Second Coleman Decl., ¶ 2.

FMCSA's FOIA Officer Tiffanie C. Coleman responded to the AHAS FOIA Request by letter dated October 27, 2006. *See* First Coleman Decl., ¶ 6. That letter informed AHAS that FMCSA had a backlog of pending FOIA requests, which would be processed in a first-in, first-out manner. *See id.* at Exh. 2. Ms. Coleman sent AHAS a second letter dated December 20, 2006, informing AHAS that FMCSA was "searching for, collecting, and examining the requested records, in an effort to provide [AHAS] with the records as soon as possible." *Id.* at Exh. 3. The letter further stated that there "appear to be hundreds, if not thousands, of potentially responsive documents," and the "voluminous amount of separate and distinct records which are demanded in [the] request" would cause a delay in FMCSA's response. *Id.* The letter was provided "for "informational purposes," and expressly stated that it was "not a denial of [AHAS's] request." *Id.*

On April 30, 2007, Ms. Coleman sent AHAS an additional letter which updated AHAS on the status of the agency's response and invited AHAS to narrow the scope of its request. *See* Second Coleman Decl. at Exh. B. The letter informed AHAS that the volume of responsive

documents involved in the AHAS FOIA Request would cause a delay in FMCSA's response. *See id.* However, the letter stated that if AHAS "narrow[ed] the scope of [its] request, allowing [FMCSA] to focus [its] efforts on a narrower timeframe and/or a specific plan or program," FMCSA might be able to "expedite the process." *Id.* As of May 23, 2007, AHAS had neither responded to that letter nor narrowed its request. *See* Second Coleman Decl., ¶ 4.

In the meantime, FMCSA has diligently searched for records responsive to the AHAS FOIA Request. Approximately 31 FMCSA offices, divisions, and personnel throughout the nation have reported that they have responsive records. *See* First Coleman Decl. ¶ 7. As a result of those reports, FMCSA estimates that there are approximately 448,000 pages of documents responsive to the AHAS FOIA Request, in hard copy and electronic form. *See id.*; Second Coleman Decl., ¶ 5. Once the final count is complete, FMCSA will have to review the responsive records to remove any duplicates. *See* First Coleman Decl., ¶ 7. FMCSA also is procuring contractual support for the processing of the Request. *See* Second Coleman Decl., ¶ 6.

AHAS initiated this action with a complaint filed March 13, 2007. *See* Dkt. Entry 1. AHAS alleges that FMCSA has unlawfully withheld documents responsive to the FOIA request. *See id.* ¶ 10. AHAS further alleges that it has constructively exhausted its administrative remedies because FMCSA did not issue a final determination on the AHAS FOIA request within 20 business days after the Request was submitted. *See id.* ¶ 9.

## <u>ARGUMENT</u>

**I.    THE FREEDOM OF INFORMATION ACT PROVIDES FOR A STAY OF PROCEEDINGS WHEN "EXCEPTIONAL CIRCUMSTANCES" ARE PRESENT.**

Although federal agencies typically must respond to FOIA requests within twenty business days, the Act expressly provides that in "exceptional circumstances," an agency may be

given additional time to process its records.  Specifically:

> [i]f the Government can show exceptional circumstances exist and that the agency
> is exercising due diligence in responding to the request, the court may retain
> jurisdiction and allow the agency additional time to complete its review of the
> records.

5 U.S.C. § 552(a)(6)(C)(i).  "Exceptional circumstances" do not include delays that "result[]

from a predictable agency workload" of FOIA requests, unless the agency "demonstrates

reasonable progress in reducing its backlog of pending requests."  *Id.* § 552(a)(6)(C)(ii).

Further, Congress has directed that courts evaluating the presence of "exceptional

circumstances" consider a requesting party's "refusal . . . to reasonably modify the scope of a

request . . . after being given an opportunity to do so by the agency to whom the person made the

request."  *Id.* § 552(a)(6)(C)(iii).

The seminal case construing Section 552(a)(6)(C) is *Open America v. Watergate Special

Prosecution Force*, 547 F.2d 605 (D.C. Cir. 1976).  The D.C. Circuit held that "exceptional

circumstances" exist when: (1) an agency is "deluged with a volume of requests for information

vastly in excess of that anticipated by Congress;" (2) the "existing resources are inadequate to

deal with the volume of such requests" within the statutory time limits; and (3) the agency can

show that it "is exercising due diligence" in processing the requests.  *Id.* at 616.  In such

situations, "[t]he good faith effort and due diligence of the agency to comply with all lawful

demands under the Freedom of Information Act in as short a time as is possible by assigning all

requests on a first-in, first-out basis, except those where exceptional need or urgency is shown, is

compliance with the Act."  *Id.*  In that regard, Section 552(a)(6)(C) creates a "safety valve" that

prevents the statutory time limits for responding to FOIA requests from being "rigid and

unworkable."  *Appleton v. FDA*, 254 F. Supp. 2d 6, 9 (D.D.C. 2003).

Following *Open America*, courts in this Circuit have interpreted Section 552(a)(6)(C) as "excusing any delays encountered in responding to a request as long as the agencies are making a good faith effort and exercising due diligence in processing the requests on a first-in first-out basis." *Ohaegbu v. FBI*, 936 F. Supp. 7, 8 (D.D.C. 1995); *Kuffel v. United States Bureau of Prisons*, 882 F. Supp. 1116, 1127 ((D.D.C. 1995) (same). That "due diligence" requirement has been deemed satisfied in cases where the agency expects that a large volume of documents will be responsive to the plaintiff's FOIA request, has used a two-track system that allows for more swift processing of less complicated FOIA requests, and/or is responding to the request as quickly as possible. *See, e.g.*, *Jiminez v. FBI*, 938 F. Supp. 21, 31 (D.D.C. 1996) (staying proceedings where FBI had a two-track system and "in view of . . . the large volume of documents expected to be responsive to plaintiff's request"); *Ohaegbu*, 936 F. Supp. at 8 (finding stay appropriate given the "two-track system and the large volume of documents expected to be responsive to plaintiff's request"); *Crocker v. United States Marshals Serv.*, 577 F. Supp. 1217, 1218 (D.D.C. 1983) (finding stay would be appropriate where agency has attempted to respond to the request "as quickly as possible"). In those circumstances, courts often grant stays of substantial duration. *See, e.g.*, *Jiminez*, 938 F. Supp. at 31 (entering stay for over three and a half years); *Ohaegbu*, 936 F. Supp. at 8 (entering one year stay); *see also Cecola v. FBI*, 1995 WL 549066, at *2 (N.D. Ill. Sept. 8, 1995) (dismissing action without prejudice because exceptional circumstances justified giving agency over 2 years to process 4500 pages).

## II.     EXCEPTIONAL CIRCUMSTANCES WARRANT ENTRY OF A STAY IN THIS CASE.

This case presents precisely the type of situation in which an *Open America* stay is warranted.  First, the massive volume of potentially responsive documents — approximately 448,000 pages — creates "exceptional circumstances," particularly given AHAS's refusal to narrow that sweeping request.  Second, FMCSA has a significant backlog of complex FOIA requests, and has adopted a two-track system for processing those requests on a first-in, first-out basis.  Finally, FMCSA is processing AHAS's FOIA Request as quickly as possible, and lacks sufficient resources to have processed the request more quickly.  Despite those difficulties, FMCSA is acting with due diligence to process the AHAS FOIA Request and reduce its backlog.

### A.     FMCSA Faces Exceptional Circumstances In Responding to the AHAS FOIA Request And Is Exercising Due Diligence to Respond to that Request.

An *Open America* stay is appropriate where, as here, the requester seeks such a large volume of documents that the agency cannot reasonably respond to the request within the statutory time limits.  *See Jiminez*, 938 F. Supp. at 31; *Ohaegbu*, 936 F. Supp. at 8.  Although FMCSA has not yet completed its search for responsive records, 448,000 pages of responsive records have been identified to date.  *See* Coleman Decl. ¶ 5.  As the Request seeks documents from all FMCSA field offices, FMCSA must coordinate its search and response among over 31 FMCSA offices, and FMCSA divisions and personnel throughout the nation.  *See id.* at Exh. A., ¶ 7.  Courts have granted *Open America* stays to allow agencies time to process significantly smaller numbers of responsive records.  *See, e.g.*, *Jiminez*, 938 F. Supp. at 31 (granting four-year stay to allow processing of 700 pages); *Ohaebgu*, 936 F. Supp. at 8 (granting one-year stay to

process 175 pages).  The Court should do the same in this case, particularly given AHAS's

refusal to narrow the scope of its sweeping request.  *See* 5 U.S.C. § 552(a)(6)(3)(C).

Despite the magnitude of the Request, FMCSA has diligently and expeditiously

processed it.  FMCSA logged the Request into the FOIA Request System the day it was

received.  *See* First Coleman Decl., ¶ 6.  FMCSA has coordinated with FOIA offices and

personnel nationwide to attempt to gather responsive records.  *See id.* ¶ 7.  Further, FMCSA is

procuring contractual commercial litigation support services to assist with processing the AHAS

FOIA Request.  *See* Second Coleman Decl. ¶ 6.  FMCSA also has sent letters to AHAS

explaining the reason for delay.  *See id.* ¶ 4; Second Coleman Decl., ¶ 6.

**B.      FMCSA's FOIA Backlog and Limited Staffing Resources Create "Exceptional Circumstances," and FMCSA Is Exercising Due Diligence to Reduce That Backlog.**

A significant backlog of FOIA requests also constitutes "exceptional circumstances"

supporting entry of an *Open America* stay.  *See Open America*, 547 F.2d at 616; *Summers v.*

*Department of Justice*, 733 F. Supp. 443, 444 (D.D.C. 1989).  Although FMCSA is a relatively

small agency, it has received a significant number of FOIA requests this year and in prior fiscal

years.  The number of "complex" FOIA requests has increased in the last three years.  In fiscal

year 2005, FMCSA received 805 complex FOIA requests.  *See* First Coleman Decl., ¶ 5.  That

number increased to 990 in fiscal year 2006.  *See id.*  FMCSA expects that the number of

"complex" FOIA requests, and the overall number of FOIA requests FMCSA receives, will

increase again for fiscal year 2007.  *See* Second Coleman Decl., ¶ 2.  Thus far, FMCSA has

received approximately 526 "complex" FOIA requests for fiscal year 2007, and an additional

214 that were not deemed "complex."  *See id.*

-14-

The steady substantial increases in the number of complex FOIA requests FMCSA receives have made it difficult for the agency's small FOIA staff to keep up. There are only seven FOIA analysts in the FMCSA FOIA office. *See* Second Coleman Decl., ¶3. That FOIA analyst staff is composed of both federal employeees and contract employees, and the most recently retained contract employee joined the staff just six weeks ago. *See id.*; First Coleman Decl., ¶ 3. Nonetheless, FMCSA has developed measures to reduce its backlog and process FOIA requests as efficiently as possible.

A "first-in, first-out" principle is the hallmark of a "fair, orderly and efficient procedure" for agencies with limited resources to equitably process large numbers of FOIA requests from numerous requesters. *Open America*, 547 F.2d at 616. FMCSA has adopted that type of system, separating "complex" FOIA requests from "simple" requests, and processing the requests in a "first in, first out manner." First Coleman Decl. ¶¶ 4-5; Second Coleman Decl. ¶ 3. Under FMCSA's current processing plan, newly received "simple" FOIAs are processed immediately. *See* Coleman Decl. ¶ 3. "Simple" FOIAs are requests that involve a small number of responsive records, to which FMCSA FOIA Office personnel have direct access. *See id.* That immediate processing of "simple" FOIAs prevents them from accruing behind the more "complex" FOIAs, and has "substantially reduced overall FOIA processing time." *Id.* The agency's use of that two-track system to process requests on a first-in, first-out basis satisfies the "due diligence" requirement. *See Appleton*, 254 F. Supp. 2d at 10; *Ohaegbu*, 936 F. Supp. at 8.

**C.**    **The Proceedings Should Be Stayed for 2 Years In Light of The "Exceptional Circumstances" Discussed Above.**

FMCSA is committed to processing the AHAS FOIA Request as quickly as possible, and to reducing its backlog of complex FOIA requests.  Indeed FMCSA, on its own initiative, has commenced a contracting effort to procure commercial litigation support services to process the AHAS FOIA Request.  *See* Second Coleman Decl. ¶ 6.  However, given the expansiveness of that Request, it would be unreasonable to expect FMCSA to have provided responsive records to AHAS within twenty or even thirty business days of its receipt of the Request.  FMCSA anticipates that a two year stay would allow it to complete its search and copy, review, and redact (if necessary) the responsive documents.  *See id.*  Accordingly, FMCSA respectfully requests that the Court stay the proceedings for two years so that FMCSA may complete those tasks.  Should the Court deem it appropriate, FMCSA would be willing to provide periodic status reports to advise the Court of the status of FMCSA's effort to respond to this complex and broad Request.

## **CONCLUSION**

For the reasons set forth above, Defendant's Motion for a Stay of Proceedings should be

GRANTED.

Dated: May 24, 2007                                   Respectfully submitted,


                                    _____/s/_____
                                    JEFFREY A. TAYLOR, D.C. BAR # 498610
                                    United States Attorney


                                    _____/s/_____
                                    RUDOLPH CONTRERAS, D.C. BAR # 434122
                                    Assistant United States Attorney


                                    _____/s/    Robin M. Meriweather_____
                                    ROBIN M. MERIWEATHER, D.C. Bar. # 490114
                                    Assistant United States Attorney
                                    555 Fourth St., N.W.
                                    Washington, D.C.  20530
                                    Phone: (202) 514-7198
                                    Fax: (202) 514-8780
                                    Robin.Meriweather2@usdoj.gov

**<u>Certificate of Service</u>**

I hereby certify that on this 24th day of May, 2007, I caused a copy of the foregoing

Motion to be served upon Plaintiff by the Court's Electronic Case Filing system or, should I

receive notice from the ECF system indicating that electronic transmission failed, to be served

by first class mail, postage prepaid addressed to:

Adina H. Rosenbaum
Public Citizen Litigation Group
1600 20th Street, N.W.
Washington, DC 20009


        /s/   *Robin M. Meriweather*
        Robin M. Meriweather
        D.C. Bar # 490114

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ADVOCATES FOR HIGHWAY AND AUTO SAFETY )<br><br>)<br><br>Plaintiff, )<br><br>)<br>v. )<br><br>)<br>FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION )<br><br>)<br><br>Defendant. )<br> ) | Civil Action No.: 07-00467 (RWR) |

### ORDER

Upon consideration of Defendant's Motion for a Stay of Proceedings, it is, this _____ day of _____, 2007,

ORDERED that Defendant's Motion for a Stay of Proceeding be and hereby is GRANTED;

it is further ORDERED that the proceedings shall be stayed for a period of two years.

SO ORDERED.

_____

United States District Judge

# EXHIBIT 1
## TO DEFENDANT'S MOTION
## FOR A STAY OF PROCEEDINGS

# Federal Motor Carrier Safety Administration

 Send to Printer

## *Testimony-March 13, 2007*

**STATEMENT OF**

**JEFFREY N. SHANE**
**DOT UNDER SECRETARY FOR POLICY**

**AND**

**JOHN H. HILL**
**ADMINISTRATOR OF THE**
**FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION**

**BEFORE THE HOUSE TRANSPORTATION AND INFRASTRUCTURE**
**SUBCOMMITTEE ON HIGHWAYS AND TRANSIT**

**MARCH 13, 2007**

| Related Links |
|---|
| Download PDF Version |
| Testimony Archive |

**INTRODUCTION**

Chairman DeFazio, Ranking Member Duncan, and Members of the
Subcommittee, thank you for inviting me today to discuss the Department of
Transportation's (DOT's) demonstration project to implement the long-delayed
trucking provisions of the North American Free Trade Agreement (NAFTA). I am
pleased to describe to you what the Department has done to implement Section
350 of the Fiscal Year 2002 Transportation and Related Agencies Appropriations
Act (P.L. 107-87; 115 Stat. 833, 864) and the additional steps we have taken to
ensure that we safeguard the safety and security of our transportation network
even as we strengthen trade with a close neighbor and important partner.

Fourteen years ago, the United States pledged to allow the free flow of commerce
across the North American continent. Three U.S. Presidents and the Congress
have considered and ultimately supported NAFTA's trucking provisions and the
Supreme Court has rejected unanimously a challenge to the Department's
implementation of those provisions, allowing us to make that pledge a reality.
Unfortunately, the delay in fully implementing NAFTA's trucking provisions has
impeded the efficient movement of goods to the markets on both sides of the
southern border to the detriment of the nation's economy. This demonstration
project begins a process that will remove this impediment, creating new
opportunities, new hope, and new jobs north and south of the border.

**BACKGROUND**

President George H. W. Bush signed NAFTA in 1992, it was enacted by
Congress and signed into law by President William J. Clinton in 1993, and it
became effective on January 1, 1994. Now, 13 years after we began
implementing the agreement, its economic benefits are clear. U.S. merchandise
exports to NAFTA partners have grown more rapidly than our exports to the rest
of the world. Real Gross National Product Growth for NAFTA partners for the
period 1993 to 2005 has been 48 percent for the United States, 49 percent for

Canada, and 40 percent for Mexico. Over that 13-year period, U.S. goods exports to Mexico and Canada have increased nearly twice as fast as our exports to the rest of the world.

Americans are reaping the benefits of this success. Each day, nearly 2.4 billion dollars in trade flows among the United States, Mexico, and Canada, offering consumers greater choices and strengthening trade and investment ties with two democratic nations and longtime allies. U.S. employment has increased substantially as well, rising from 112.2 million in December 1993 to 134.8 million in February 2006. The jobs these exports support are particularly valuable to American workers, as they pay between 13 and 18 percent more than the U.S. national average. All of this helps to explain why, between 1993 and 2006, the nation's real Gross Domestic Product has nearly doubled. This record demonstrates that we must move forward to fully implement NAFTA.

One of the agreement's few remaining provisions to be implemented is the cross-border trucking provision. Originally planned to commence in December 1995 with transportation between Mexico and the four Border States ( Arizona, California, New Mexico, and Texas), it was to have been fully implemented by January 1, 2000. In December 1995, Transportation Secretary Peña announced an indefinite delay in "opening" the border to long-haul Mexican commercial trucks to address legitimate concerns about the safety of Mexican trucks that would be traveling on our highways.

Twelve years later these concerns have been addressed and, n ow that safety and security programs are in place, the time has come for us to move forward on a long-standing promise with Mexico and Canada by taking the trucking provisions of the North American Free Trade Agreement off hold.

**DEMONSTRATION PROJECT**

Over the last twelve years, there has been a long, on-going conversation about the safety, security, environmental, and economic issues involved with allowing trucks from Mexico to operate in the U.S. beyond the border zones. This conversation has occurred between DOT and Mexico's Ministry of Communications and Transport; it has occurred between the Presidents of our nations; it has occurred in the House and Senate chambers; it has occurred in the media; it has occurred in front of a NAFTA dispute settlement panel, a U.S. Court of Appeals, and even the United States Supreme Court. What this conversation made clear is that there were a number of important and difficult issues that had to be addressed before we could move forward with a graduated border opening.

For that reason, the Administration is implementing a limited one-year demonstration project to authorize up to 100 Mexican trucking companies to perform long-haul operations within the U.S. These companies will be limited to transporting international freight and will not be authorized to make domestic deliveries between U.S. cities. Likewise, under this program, Mexico will grant authority to an equivalent number of U.S. companies to make deliveries between the U.S. and Mexico. This will be the first time that American trucks have been allowed to make deliveries in Mexico in over twenty-five years. The U.S. and Mexican governments have established two groups to provide oversight for the demonstration project. The first, a bi-national group, will provide continuous monitoring of the project and identify and resolve any implementation issues as they arise. The second, an evaluation group composed only of U.S. representatives knowledgeable with the issue, will be tasked with measuring and evaluating the results of the demonstration project. We believe that this combination of monitoring and oversight will both provide the means for addressing implementation issues in a timely fashion and also an independent means for objective evaluation of the project once it is complete. In addition, we

are aware you have asked the Inspector General to conduct a separate review of the demonstration project to ensure the 100 carriers participating in the program are in full compliance with all U.S. federal motor carrier safety laws, including the provisions detailed in Section 350. We welcome the on-going involvement of the Inspector General and any ideas he may have to improve the effectiveness of the program.

By granting authority to a limited number of Mexican carriers and monitoring them closely throughout the duration of the project, we will be able to monitor and evaluate the adequacy of the safety systems we have developed to address the concerns raised since 1995.

There are no exceptions to safety regulations for trucks from Mexico. Mexico's trucks and drivers must meet all U.S. safety requirements before they cross the border now, and before they will be allowed to drive beyond the border region. All drivers must have a valid commercial driver's license, proof of medical fitness, and verification of compliance with hours-of-services rules. They must be able to understand and respond to questions and directions from U.S. inspectors, undergo drug and alcohol testing, and cannot be under the influence of drugs or alcohol. All trucks must be insured by a U.S. licensed insurance company and meet U.S. safety standards.

Let me put the magnitude of this demonstration project in context. Today, over 700,000 interstate trucking companies and approximately 400,000 intrastate companies are registered to operate in the U.S. Over 8 million large trucks are registered in the United States. We expect that the 100 Mexican trucking companies in this program will operate approximately 1,000 trucks in the U.S.

It is also important to note that the demonstration project will not involve hazardous materials transportation, bus transportation of passengers, or operation of longer combination vehicles by Mexican carriers.

**SAFETY**

Safety is at the heart of all we do at DOT and it has been foremost in our thoughts as we prepared to change the way trucks from Mexico operate in the U.S. Development of our safety programs has been guided by, but not limited to, the 22 requirements that Congress included in the 2002 Act. I can assure you that the Federal Motor Carrier Safety Administration (FMCSA) has addressed each of these requirements and I have attached to the written testimony a table of these requirements and the actions FMCSA has taken to satisfy them.

Two weeks ago, Secretary Peters traveled to Monterrey, Mexico, to visit a Mexican trucking company. There, she witnessed FMCSA personnel conducting a pre-authorization safety audit required by Section 350 on the motor carrier. Under the law, 50 percent of these audits must take place at the carrier's place of business in Mexico. For this demonstration project, FMCSA will conduct 100 percent of pre-authorization safety audits in Mexico. These audits ensure that Mexican carriers wishing to operate in the U.S. beyond the border zones have systems in place to comply with all DOT regulations, including driver qualification, drug and alcohol testing, hours-of-service, vehicle maintenance, and insurance.

During the pre-authority safety audit, FMCSA inspectors also conduct vehicle inspections of trucks a company wishes to use in the U.S. The inspection is a comprehensive 37-step process that involves checking the vehicle from front to back and top to bottom. At the conclusion of this inspection, if no defects are discovered, the vehicle is issued a 90-day Commercial Vehicle Safety Alliance (CVSA) safety decal. All trucks operating in the test program will be required to

display a current decal at all times while operating in the U.S., which means they will be inspected at least once every 90 days.

This safety audit is merely the beginning of FMCSA's oversight. All Mexican trucks operating beyond the border zones will have a unique identifier, an X at the end of the DOT number marked on the vehicle. This is so it is easily visible to FMCSA and State inspectors. When these trucks reach the border, they will be subjected to additional vehicle inspections and license checks. Under Section 350, FMCSA is required to check the validity of licenses for 50 percent of the drivers entering the country.

Since 1995, FMCSA has spent more than $500 million to improve border inspection stations and hire more than 600 new Federal and State inspectors to enforce truck safety on the border. We have deployed 125 inspectors and an additional 149 auditors and investigators along the Southern Border at all truck crossings. Our State partners in Arizona, California, New Mexico, and Texas have deployed an additional 349 inspectors. These safety professionals oversee the safety of Mexican trucks providing transportation in the existing border commercial zones and have made noteworthy progress in establishing the safety foundation for this demonstration project. These inspectors conducted more than 210,000 driver and vehicle inspections of Mexico-domiciled carriers in the commercial zone during fiscal year 2006 and performed over 240,000 automated, real-time, checks of Mexican drivers' licenses. Their efforts are paying off. Ten years ago, the out-of-service rate for Mexican trucks was 59 percent. Since the increased enforcement that resulted from hiring the additional FMCSA and State staff, the rate dropped to 21 percent last year, which is comparable to the out-of-service rate we typically observe when we select U.S. trucks for inspection.

I also want to highlight that while these inspectors have been effective and will assist the Department in satisfying its Congressional requirements, we are already looking toward more comprehensive and effective screening methods for the future. FMCSA is working with Customs and Border Protection (CBP) to have motor carrier safety integrated into the International Trade Data System, or ITDS, which is part of the Automated Commercial Environment development effort. When this initiative becomes fully operational, every Mexican company will have its authority and insurance checked and every Mexican driver will have his or her license checked each time the driver crosses the border, whether the vehicle is operating within the commercial zone or involved in long-haul transportation. In fact, since these computer checks occur prior to a carrier's arrival at the Southern Border, if we discover a problem, we will actually send notice back to the company or broker entering the information so issues can be addressed before the truck even reaches our Southern Border points of entry. If the truck does arrive at the Border, the CBP agent will receive notice that there is an issue with the truck and direct it for further inspection by FMCSA or our State partners.

While in the U.S., the performance of these Mexican carriers will be closely monitored. We have established, through rulemaking, a list of seven safety problems related to driver licensing, operating unsafe vehicles, drug and alcohol testing and insurance - we call them the 7 deadly sins - which would lead to action by FMCSA up to and including revocation of a carrier's provisional authority if not promptly addressed.

FMCSA has worked with State and local law enforcement officials so they can assist in ensuring Mexican trucks operate safely and within the limits of their authority. In 2002, FMCSA established regulations prohibiting all carriers from operating beyond the scope of their authority. Since that time, every State has adopted and begun enforcing these provisions. The Commercial Vehicle Safety Alliance (CVSA) has incorporated this violation into its Out-of-Service criteria, meaning that a Mexican truck discovered operating beyond the scope of its

authority will be stopped and not allowed to continue. We have incorporated these new regulations into the training it gives to all commercial vehicle inspectors.

FMCSA and the International Association of Chiefs of Police have developed a commercial motor vehicle awareness training program. We have trained over 200 law enforcement officers to instruct other law enforcement officials about how to identify a Mexican motor carrier, how to verify the validity of a Mexican driver's commercial license, how to determine the carrier is operating within its authority, and who to call if they need additional assistance with truck-specific issues. Through this program, we are reaching out to the more than 500,000 State and local law enforcement officers in the U.S.

In addition to the Federal safety requirements, the Mexican trucks operated in this demonstration project will be required to adhere to the same State requirements as U.S. trucks, including size and weight requirements and paying the applicable fuel taxes and registration fees. In preparation for this project, FMCSA has worked with the four Border States to develop the capability for these States to register Mexican trucks in the International Registration Plan and International Fuel Tax Agreement.

## SECURITY AND ENVIRONMENT

While safety is the highest priority, the issues involved in this demonstration project are not limited to safety. For this reason, the Department has coordinated closely with other Executive Branch agencies, particularly with the Department of Homeland Security (DHS) on border security matters and with the Environmental Protection Agency (EPA) to address environmental issues. While these agencies can better speak to their programs in detail, let me share with you an overview of what is being done to address these areas.

The majority of vehicles Mexican trucking companies will use for long-haul operations have been manufactured to meet both U.S. and Mexican emission standards. In fact, most commercial motor vehicles now entering the U.S. from Mexico were manufactured in the U.S. or Canada, meaning that they were manufactured to U.S. emissions standards. As breakdowns are costly for shippers, we expect that the fleet of trucks used for long-haul cross-border transportation will be newer and cleaner. We anticipate that Mexican companies will maintain or expand their use of equipment that is manufactured to meet U.S. standards. Mexico has also upgraded its domestic vehicle emission requirements in the last three years and now has regulations similar to those currently in effect in the United States. EPA is working with the Mexican government to encourage full adoption of new U.S. truck and fuel standards.

On a yearly basis, CBP processes about 4.5 million trucks through the U.S.-Mexico Border. It is estimated that the 100 carriers in this demonstration project will account for approximately 1,000 trucks, a very small percentage of the CBP workload. Implementing this demonstration project will not change our border security or immigration security posture.

## Current Processing
All commercial truck cross-border traffic must stop at a designated border crossing. As required by statute and regulation, each truck will be processed at the border, using automated systems to assist in determining whether the cargo, truck, and driver are admissible and whether any of the elements pose a security, immigration, agriculture, or smuggling risk.

If the CBP officer determines that further inspection is necessary, the driver, truck, and cargo are referred for a secondary inspection. In a secondary inspection,

CBP officers have many inspection tools at their disposal, including access to commercial, criminal and law enforcement databases, forensic document equipment, agricultural experts, and large scale scanning systems.

If the CBP officer performing primary or secondary inspections determines that the driver, truck, and cargo are admissible and do not pose a risk, then the driver is allowed to proceed into the United States. The Mexican carrier is then able to deliver the cargo to a location within the commercial border zone, which can range up to 25 miles from the border (or 75 miles from the border within Arizona). The cargo remains within the commercial zone until it can be picked up by a U.S. driver and truck.

Current CBP inspections are in addition and separate from motor carrier inspections. The current CBP inspections and the current motor carrier inspections will continue under the demonstration project.

**Demonstration Project**
Under the demonstration project, processing of Mexican nationals and commercial trucks will continue according to CBP guidelines. All cross-border commercial truck traffic will continue to be required to stop at a designated border crossing. Mexican drivers will be required to present an entry document, and if traveling outside the 25-mile commercial zone (or 75-mile limit within the state of Arizona), the drivers will be issued a Form I-94 pursuant to regulations and in accordance with US VISIT procedures that include biometric and security requirements.

CBP processing of drivers, cargo, and conveyances for security screening and trade enforcement will remain consistent for truck carriers participating in this demonstration project. Participants will continue to provide advanced cargo information as required under the Trade Act of 2002. Participants will remain subject to immigration entry requirements for the driver and crew and to the import requirements of other government agencies in order to gain entry into United States commerce.

DOT and DHS will continue to partner in this effort to ensure safety and security requirements are completely addressed and satisfied prior to a carrier being allowed to proceed to an interior location in the United States.

**CONCLUSION**

Trucks from Mexico have always been allowed to cross the U.S. border. Until 1982, they could travel anywhere in the United States. For the last 24 years they have been restricted to specific border areas in Arizona, California, New Mexico, and Texas. Every day, thousands of trucks from Mexico enter the United States. Every day, drivers from Mexico operate safely on roads in major U.S. cities like San Diego, El Paso, Laredo, and Brownsville. And every day, Federal and State inspectors ensure trucks are safe to travel on our roads.

We have developed a limited program to demonstrate the effectiveness of the systems we have deployed to satisfy Section 350 of the 2002 Appropriations Act and to ensure the safety of the U.S. traveling public. And now, we are ready to change the way trucks from Mexico operate in the United States.

Thank you for the opportunity to appear before you today. I look forward to working with this Committee and the transportation community to ensure a safe transportation system for the citizens of the United States and to strengthen our trade with Mexico.

**Find this page at:** http://www.fmcsa.dot.gov/about/news/testimony/tst-031307.htm

Feedback | Privacy Policy | USA.gov | Freedom of Information Act (FOIA) | Accessibility
Web Policies and Important Links | Site Map | Plug-ins

Federal Motor Carrier Safety Administration
1200 New Jersey Avenue SE, Washington, DC 20590 • 1-800-832-5660 • TTY: 1-800-877-8339
Field Office Roster

# EXHIBIT 2
## TO DEFENDANT'S MOTION
## FOR A STAY OF PROCEEDINGS

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ADVOCATES FOR HIGHWAY AND AUTO SAFETY | ) ) ) ) |
| Plaintiff, | ) Civil Action No.: 07-00467 (RWR) ) |
| v. | ) ) |
| FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION | ) ) ) ) |
| Defendant. | ) ) |

DECLARATION OF TIFFANIE C. COLEMAN

1. I continue to serve as the Freedom of Information Act (FOIA) Officer for the Federal Motor Carrier Safety Administration (FMCSA), an operating administration within the U.S. Department of Transportation. I adopt and re-affirm paragraphs 1 and 2 of my earlier declaration to the court dated April 11, 2007 (Exhibit A).

2. In my earlier declaration, I declared the number of "complex" FOIAs served upon FMCSA increased in Fiscal Year 2006. I project the number to increase again for Fiscal Year 2007. I project the overall number of FOIAs served upon FMCSA to increase again for Fiscal Year 2007 as well. As of May 23, 2007, FMCSA has

received 740 FOIA requests in Fiscal Year 2007, 526 of which are "complex" FOIAs.

3. Based upon the growing number of FOIAs served upon FMCSA, FMCSA continues to have a backlog of FOIA requests to be processed.    We are now reducing that backlog and it will continue to be reduced.  Since my declaration dated April 11, 2007, we added a fourth contract employee to the FMCSA FOIA Office.  As of February, 2007, I adopted a new FOIA processing plan where newly received "simple" FOIAs are immediately processed.  "Simple" FOIAs are defined as those FOIAs where FMCSA FOIA Office personnel have direct access to the responsive records and there is a small number of responsive records. Immediate processing of these "simple" FOIAs has prevented them from accruing behind the complex FOIAs and has substantially reduced overall FOIA processing time.

4. As said in my earlier declaration, the Plaintiff's FOIA is a "complex" FOIA.  In a letter dated April 30, 2007, and sent to the Plaintiff via facsimile and via regular mail that same date (Exhibit B), I invited the Plaintiff to narrow the scope of its FOIA, as a more narrow-in-scope FOIA would likely expedite FMCSA processing.  My facsimile receipt for the April 30, 2007 facsimile transmission shows Plaintiff received it.  As of the date of this declaration, Plaintiff has not responded and has not narrowed its FOIA request.

5. Since my earlier declaration, the estimate of pages reported as being responsive to this FOIA has also increased from 443,000 to 448,000 pages.

6. The FMCSA FOIA Office continues to process this FOIA as part of its overall

FOIA program.  I am also involved in a contracting effort to procure commercial

litigation support services for this FOIA specifically.  With this new contractual

support, I estimate that for this FOIA request, the total processing time will take

approximately 18 to 24 months.

Executed on: 5/03/07

TIFFANIE C. COLEMAN

# EXHIBIT A
## TO DECLARATION OF TIFFANIE C. COLEMAN (May 23, 2007)

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ADVOCATES FOR HIGHWAY AND AUTO SAFETY | ) ) ) ) |
| Plaintiff, | ) Civil Action No.: 07-00467 (RWR) ) |
| v. | ) ) |
| FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION | ) ) ) |
| Defendant. | ) ) ) ) |

## DECLARATION OF TIFFANIE C. COLEMAN

1. I am the Freedom of Information Act (FOIA) Officer for the Federal Motor Carrier Safety Administration (FMCSA), an operating administration within the U.S. Department of Transportation. I oversee the FMCSA FOIA Office and the FMCSA FOIA program. I have served in this position since April, 2004. Before I became the FMCSA's FOIA Officer, I was a contracted FOIA Analyst who worked for the FMCSA FOIA Office from October, 2002, to April, 2004.

2. I make this declaration on the basis of personal knowledge. In the event I am called as a witness, I could competently testify to the facts contained in this declaration.

3. As the FMCSA FOIA Officer, I am responsible for processing all FOIA requests served upon FMCSA. I am responsible for processing subsequent appeals of FMCSA responses as well. I sign all letters to FOIA requesters except FMCSA FOIA appeal decisions. On my FOIA staff, there are six FOIA analysts - three Federal employee analysts and three contractor analysts. I am one of the three Federal employee FOIA analysts.

4. When the FMCSA FOIA Office receives a FOIA request for FMCSA records, we first review it to determine the subject matter and complexity of the request. In FMCSA, a FOIA request is labeled "complex" when it asks for multiple records, when we see it will involve multiple custodians of records within FMCSA, when we see it will involve multiple FMCSA research systems, or when we see it may have an issue which would require legal review. We then log it into the FOIA tracking system and assign a FOIA control number. The request is then placed in a holding area, along with other FOIAs recently received, and is processed in the "first in, first out" manner.

5. Since FY05, the number of "complex" FOIAs served upon FMCSA has increased. In FY06, the number received was 990, which is an increase from 805 complex FOIAs received in FY05. As of the date of this declaration, the FMCSA FOIA Office is processing 434 complex FOIAs, again on the "first-in, first-out" basis.

6. The Plaintiff's FOIA (Exhibit 1) is a "complex" FOIA. It was received and logged into our FOIA Request System on October 25, 2006. Its FMCSA "FOIA Control Number" is 2007-0083. I acknowledged receipt of the Plaintiff's FOIA

in a letter to Plaintiff dated October 27, 2006 (Exhibit 2).   In my letter, I indicated we had a backlog of pending FOIA requests to be processed.   In a letter to Plaintiff's point of contact dated December 20, 2006 (Exhibit 3), I informed Plaintiff FMCSA determined there would be hundreds, if not thousands, of responsive records and there would be additional delay in processing this FOIA.  I promised Plaintiff more information regarding FOIA 2007-0083 as soon as possible.

7.   The FMCSA FOIA Office is working closely with the rest of FMCSA to determine the size of this FOIA.  To date, we estimate approximately 443,000 pages are responsive to this FOIA, said pages being from both hard copy and electronic records.   Approximately 31 offices, divisions, and personnel within FMCSA and throughout FMCSA nationwide are reporting to have responsive records.    Some offices, divisions, and personnel may be identifying the same record or records at this point in time.  If so, the FMCSA FOIA Office would add "removal of duplicates" to its tasks associated with this FOIA.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: April 11, 2007

TIFFANIE C. COLEMAN

# COLEMAN
# DECLARATION
# EXHIBIT 1



**ADVOCATES**
FOR HIGHWAY
AND AUTO SAFETY
750 First Street, NE, Suite 901
Washington, DC 20002



October 17, 2006

Federal Motor Carrier Safety Administration
U.S. Department of Transportation
400 Seventh Street, SW
Washington, DC 20590

<u>**FOIA Request**</u>

Pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, Advocates for Highway and Auto Safety (Advocates) requests that the Federal Motor Carrier Safety Administration (FMCSA, the agency) provide access to the following:

- All records regarding any and all FMCSA activities to formulate, develop, evaluate, implement, or otherwise consider any effort, plan, initiative, pilot program or other program intended to evaluate any Mexico-domiciled motor carriers that would be permitted by FMCSA to operate beyond the current U.S. municipalities and commercial zones on the U.S. – Mexico border.

- All records that discuss, evaluate, consider or refer to how such an effort, plan, initiative, pilot program or other program for evaluating any Mexico-domiciled motor carriers operating beyond the current U.S. municipalities and commercial zones on the U.S. – Mexico border complies with the funding restriction of Section 350(a) of the Fiscal Year 2002 U.S. Department of Transportation and Related Agencies Appropriations Act, Pub. L. 107-87 (Dec. 18, 2001).

- All records that consider, discuss, evaluate, or refer to the specific policy considerations, decisions, and actions by the FMCSA and the U.S. Department of Transportation for how any such pilot program or other program, plan, or initiative for evaluating some Mexico-domiciled motor carriers operating beyond the current U.S. municipalities and commercial zones on the U.S. – Mexico border complies with each specific requirement set forth in Sections 350(a) and (b) of the Fiscal Year 2002 U.S. Department of Transportation and Related Agencies Appropriations Act cited above.

The scope of this request includes, but is not limited to, drafts, memoranda, letters, electronic mail and files, technical analyses, technical assistance documents, and tables, both at headquarters and agency field offices, and covers the period of time from December 18, 2001, to the date of receipt of this FOIA request.

Advocates for Highway and Auto Safety
FOIA Request
October 17, 2006
Page 2

Following your notification to us of having searched and identified the relevant records within the statutory time frame controlling a response to a FOIA request, we will arrange with FMCSA personnel to inspect the records you make available to us and then determine whether and to what extent any duplication of selected records might be required.

Should you deny access to any of the requested records, please describe each denied record in detail and, in each instance of denial, state the exact statutory basis for your denial as well as your reasons for believing that this statutory basis for denial should be applied in this instance. Also state separately your reasons for not invoking your discretionary authority to release the records in the public interest. If you determine that some records or portions thereof are exempt from release and you decide not to release them, we ask that you promptly provide us with access to all other records or segregable portions thereof.

Since furnishing the records, including any necessary duplication, will be used solely to inform Congress and the public of the safety effects of permitting commercial motor vehicles operated by Mexico-domiciled motor carriers to conduct commerce beyond the U.S. municipalities and commercial zones on the U.S. – Mexico border, we ask that any fees associated with this request be waived pursuant to 5 U.S.C. § 552(a)(4)(A) for Advocates, a not-for-profit, consumer advocacy organization. Advocates has no commercial interest in, and will make no commercial use of, any materials supplied to us pursuant to your release on any of the requested records. Moreover, a release of the requested records will generate benefits for the general public by, among other things, helping to promote public awareness of the safety impacts of FMCSA decisions and actions affecting federal laws, regulations, and commercial transportation practices under its jurisdiction, including the quality of the agency's ability to effect compliance with relevant laws and regulations governing the operation of Mexico-domiciled commercial motor vehicles beyond the municipalities and commercial zones on the U.S. – Mexico and to meet Congressional and U.S. Department of Transportation objectives for enhancing motor carrier safety and the safety of the traveling public. In further support of a fee waiver, a statement is enclosed of Advocates' extensive qualifications and activities as a not-for-profit, public interest organization in the field of motor vehicle and highway safety.

We suggest that you initiate your search for the relevant records responsive to this FOIA request by contacting Mr. William Quade, FMCSA staff. Advocates' identification of this agency employee is an effort to assist the agency in starting its search for responsive records and is not an attempt to limit the scope of your investigation or the number of personnel whom you contact for records falling within the scope of Advocates' FOIA request.

Access to the records sought through this FOIA request is required within 20 days of your receipt of the request in conformity with 5 U.S.C. § 552(a)(6)(A)(i). If you anticipate the need for any delay beyond this time limit for responding to our request, you are required to notify us promptly in writing

Advocates for Highway and Auto Safety
Freedom of Information Act Request
October 17, 2006
Page 3

of the need for and the length of the prospective delay.  However, we also would appreciate timely telephone calls placed to the telephone number on this letterhead informing the undersigned of the progress and completion of your compliance with this FOIA request.  If some records falling within the scope of our FOIA request are available prior to completion of FMCSA's search for and identification of all relevant records that are responsive to our request, we would appreciate an opportunity to inspect such records as soon as they can be made available.

Respectfully submitted,

Gerald A. Donaldson, Ph.D.
Senior Research Director

ENCS:  1



**ADVOCATES**
FOR HIGHWAY
AND AUTO SAFETY

750 First Street, NE, Suite 901
Washington, DC 20002

### ADVOCATES FOR HIGHWAY AND AUTO SAFETY
### SUPPLEMENTAL INFORMATION
### IN SUPPORT OF FOIA FEE WAIVER APPLICATION

Advocates for Highway and Auto Safety ("Advocates") is a non-profit, educational and lobbying organization dedicated to reducing the number of deaths and injuries and the societal cost of motor vehicles crashes on our nation's highways. Advocates supports public policies that will promote crash and injury prevention as well as result in cost-savings. To accomplish these goals Advocates engages in research and analysis of motor vehicle and highway safety issues and data, and disseminates this information to the public, the media and Congress. Advocates is a nationally recognized public interest organization that fosters government action at all levels to decrease highway losses and improve public health and safety for the traveling public. Advocates participates in developing legislative and regulatory policies, expanding public knowledge and understanding of highway safety issues and reducing the devastating personal losses and societal impacts of deaths and injuries in motor vehicle crashes. Advocates addresses both vehicle safety, including passenger vehicles, light-duty trucks, as well as commercial motor vehicles (trucks and motor coaches) and highway safety issues of major concern to the public in the following ways:

- Dissemination of information and educational materials to the general public, the media, Congress, and other interested organizations;

- Providing the public with insight and understanding of the operations, activities, and processes of government regarding highway and auto safety;

- Responding with comments to agency rulemaking proposals and other initiatives that affect safety in order to encourage agency action and policies that will enhance highway and auto safety;

- Supporting safety legislation, including testifying before committees of the U.S. Congress and state legislatures and at agency safety hearings;

- Presenting speeches on highway and auto safety before transportation organizations and publishing articles in authoritative journals and magazines;

- Participating in professional transportation organizations, societies and safety coalitions.

1

Advocates is a coalition of safety-oriented organizations and has no commercial or profit-making interest in highway and vehicle safety.  Agency records obtained by Advocates under the Freedom of Information Act are not used for any commercial purpose or offered for resale. Actions taken by Advocates are entirely in the public interest for the purpose of promoting improvements in highway and auto safety that benefit the general public.

Advocates has a long history of involvement in issues that affect commercial motor vehicles and national commercial motor vehicle safety policy, including the safety impacts of foreign commercial motor vehicle operations in the U.S.  The purpose of Advocates requesting public documents regarding foreign motor carrier and commercial motor vehicle safety effects when operating in the U.S. is to enlighten the public about the role of federal and state government in developing and adopting policies that affect transportation policy and to educate the public about transportation policy issues and how governmental decisions impact their safety.

2

# COLEMAN DECLARATION EXHIBIT 2



US Department
Of Transportation

**Federal Motor Carrier
Safety Administration**

400 – Seventh St., SW
Washington, DC 20590

10/27/2006

FOIA Control No: 2007-0083

Mr. Gerald A. Donaldson
Advocates for Highway and Auto Safety
750 First Street, NE, Suite 901
Washington, DC 20002

Dear Mr. Donaldson:

This letter acknowledges receipt of your Freedom of Information Act (FOIA) request dated 10/17/2006, requesting a copy of all records relating to the planned evaluation of Mexican carriers that will be permitted to operate beyond the current commercial zone. Your request was received in our office on October 25, 2006.

Because of heavy interest in motor carrier safety, we have a slight backlog of FOIA requests, which are processed on a first in, first out manner.

Should the search, review, and photocopy fees associated with processing your request exceed $25.00, you will receive advance notification from our office.

If you have any questions regarding your request, please contact our FOIA Request Service Center at (202) 366-2960 or email at foia@fmcsa.dot.gov. Please be sure to refer to the FOIA Control Number above, in your correspondence. For more information please visit our website at http://www.fmcsa.dot.gov/foia/index.htm.

Sincerely,

Tiffanie C. Coleman
Freedom of Information Act Officer
Management Information and Directives Division

# COLEMAN DECLARATION EXHIBIT 3



U.S. Department
of Transportation

Federal Motor Carrier
Safety Administration

400 - Seventh St., SW
Washington. DC 20590

DE  2 5  2006
Refer to: MC-MMI
Control No. 07-0083

Dr. Gerald A. Donaldson
Advocates for Highway and
  Auto Safety
750 First Street, NE, Suite 901
Washington, D.C. 20002

RE:     Freedom of Information Act (FOIA) Request No. 2007-0083 regarding the evaluation of
        Mexico- domiciled carriers that would be permitted to operate beyond the U.S. – Mexico
        commercial zone.

Dear Dr. Donaldson:

The Federal Motor Carrier Safety Administration (FMCSA) received the above-
referenced FOIA request from your office on October 25, 2006. You have requested,
among others, documents "regarding any and all FMCSA activities to formulate ...any
plan, initiative, ... or program intended to evaluate any Mexican-domiciled motor carrier
that would be permitted by FMCSA to operate beyond the current municipalities and
commercial zones on the U.S. – Mexico border.

We are searching for, collecting, and examining the requested records, in an effort to
provide you with the records as soon as possible. However, we have already determined
that there appear to be hundreds, if not thousands, of potentially responsive documents.
Because of the voluminous amount of separate and distinct records which are demanded
in your request, we are advising you of the delay of our response. We will contact you as
soon as possible concerning the approximate number of documents that will need to be
examined and the date by which we expect to complete our review. We will address your
request for the waiver of fees in subsequent correspondence.

This letter is for informational purposes and is not a denial of your request. If you have
any questions about your request, please refer in your correspondence, to the FOIA
control number indicated above.

                        Sincerely,

                        Tiffanie C. Coleman
                        FOIA Officer

# EXHIBIT B
## TO DECLARATION OF TIFFANIE C. COLEMAN
## (May 23, 2007)



**U.S. Department
of Transportation**

**Federal Motor Carrier
Safety Administration**

400 - Seventh St., SW
Washington, DC 20590

Refer to: MC-MMI
Control No. 2007-0083

Dr. Gerald Donaldson
Advocates for Highway and Auto Safety (AHAS)
750 First Street, NE, Suite 901
Washington, D.C. 20002

RE:    AHAS Freedom of Information Act (FOIA) Request No. 2007-0083

Dear Dr. Donaldson:

This letter is an update for your FOIA request, Control Number 2007-0083, requesting all records relating to Federal Motor Carrier Safety Administration (FMCSA) plans or programs to evaluate any Mexican-domiciled motor carrier intending to operate beyond the current municipalities and commercial zones on the United States - Mexico border.

The number of pages reported by FMCSA offices, divisions, and personnel as being responsive to your FOIA has risen to approximately 448,000. This is an increase from the April 11, 2007, 443,000-page estimate FMCSA gave to the court in its April 11, 2007, motion to the court (Advocates for Highway and Auto Safety v. Federal Motor Carrier Safety Administration, Civ. No. 07-00467 (RWR)). We are continuing to search for, review, and process responsive records.

As we previously noted to you, due to the number of responsive documents involved in this FOIA request, there will be a delay in providing you a response. However, if you wish to narrow the scope of your request, allowing us to focus our efforts on a narrower timeframe and/or a specific plan or program which you identify, we may be able to expedite the process.

Please let us know if you are willing to discuss narrowing the scope of your request. In order to facilitate such a discussion, we would appreciate hearing from you no later than Friday, May 11, 2007.

Sincerely,

Tiffanie C. Coleman
FOIA Officer